IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DENNIS RYBACKI,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 13-cv-1058-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Dennis Rybacki, represented by counsel, seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Rybacki applied for DIB in October, 2010, alleging disability beginning on September 7, 2010. (Tr. 18). After holding two evidentiary hearings, ALJ William L. Hafer denied the application for benefits in a decision dated February 21, 2013. (Tr. 18-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 21.

Plaintiff raises only one point, that is, that the ALJ ignored his complaint of sensitivity to light even though that complaint was supported by objective evidence.

### **Applicable Legal Standards**

To qualify for DIB a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual

> functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national

economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Rybacki was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Hafer followed the five-step analytical framework described above. He determined that Mr. Rybacki had worked since the alleged onset date, but this work

did not rise to the level of substantial gainful activity. He was insured for DIB through December 31, 2015. He found that plaintiff had severe impairments of status post 2004 skull fracture with residual right ear hearing loss, headaches and dizziness. He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Rybacki had the residual functional capacity (RFC) to perform work at all exertional levels, limited to only occasional climbing of stairs, no climbing of ladders, ropes or scaffolding, no work at unprotected heights or around dangerous moving machinery, and no work around high levels of ambient noise. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past work as a machine operator. However, he was not disabled because he was able to do other jobs which exist in significant numbers in the national and regional economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is limited to the relevant time period.

1. **Agency Forms**

Plaintiff was born in 1973, and was almost 37 years old on the alleged onset date of September 7, 2010. (Tr. 198). He said that he was unable to work because of headaches, dizziness, loss of hearing in the right ear, balance problems and sinus problems resulting from multiple skull fractures. (Tr. 192). In a later report, plaintiff said that, beginning in the winter of 2010, he was having blurred

vision.  (Tr. 211).

Plaintiff had worked as machine operator in a factory from 1994 to September, 2010.  He had obtained a GED.  (Tr. 193).

### 2. Evidentiary Hearings

Mr. Rybacki was represented by an attorney at both evidentiary hearings. (Tr. 32, 61).

The first hearing was held on July 20, 2012.  (Tr. 61).  The ALJ noted that plaintiff's attorney had requested a consultative neurological exam, but he "reluctantly" refused the request because "that will be a difficult thing to obtain in the area where Mr. Rybacki lives in southern Illinois."  (Tr. 64).

Plaintiff's attorney pointed out that plaintiff was wearing sunglasses because "the intensity of the light in the room has – is exacerbating his headache."  (Tr. 67).

Mr. Rybacki suffered a "skull-crushing type injury" in an on-the-job accident in 2004.  (Tr. 66).  He returned to his job as a machine operator after the injury, but was fired in 2010 for missing too much work.  He received unemployment compensation benefits for about a year and a half.  He applied for jobs during that time.  (Tr. 70-71).  Plaintiff testified that, after his injury, he was not able to meet the production demands of the job, and was written up a couple of times for "not hitting my numbers."  (Tr. 82).

Plaintiff testified that he had good days and bad days.  On bad days, he had headaches and floaters before his eyes.  He had to lie down in a dark room with no sound and "try to sleep it off."  His headaches might last for two or three hours, or sometimes he might not be able to get rid of it.  He had taken prescription

medicine, but found that Excedrin worked as well. Sometimes the medicine worked, and sometimes it did not. He also had episodes of dizziness, for which he took Meclizine. (Tr. 72-75). He also testified that he was having more bad days now than he had when he was still working. (Tr. 84).

The hearing was adjourned so that a psychological consultative exam could be obtained. (Tr. 85-86).

A second hearing was held on February 5, 2013. (Tr. 34). Plaintiff testified that he had at least two to three headaches a week and they lasted from an hour to about six hours. When he had a headache, he laid down in a dark, quiet room. He took Sumatriptan for headaches and Meclizine for dizziness. (Tr. 41-52). He was only able to afford nine Sumatriptan pills a month, so he also took nonprescription medication for his headaches. (Tr. 49-50).

Mr. Rybacki testified that he wore sunglasses indoors "if my headaches get pretty severe." He wore sunglasses outside if he had a headache. His attorney asked him whether he could "handle light like that's [sic] in this room when you're having an episode?" Plaintiff responded "Not, not at all when I'm having an episode. It's almost too bright for me right now." (Tr. 53).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to his ultimate RFC assessment, that is, a person who was able to perform work at all exertional levels, limited to only occasional climbing of stairs, no climbing of ladders, ropes or scaffolding, no work at unprotected heights or around dangerous moving machinery, and no work around high levels of ambient noise  The VE testified that this person could not do

plaintiff's past work but could do other jobs such as light and medium janitorial work.  (Tr. 56-57).

Plaintiff's attorney asked the VE "if we added that the claimant needed to be in a work environment with dimmed, only moderate lighting, would that preclude the janitorial jobs?"  The VE testified that it would.  Counsel then asked whether there are any jobs "that would generally allow for an individual to have essentially a sunglasses on type of lighting atmosphere?"  The VE's response does not appear in the transcript, but the context indicates that he responded in the negative.  (Tr. 58).

    4.    **Relevant Medical Treatment**

Plaintiff was admitted to St. Louis University Hospital in St. Louis, Missouri, on November 29, 2004, following a workplace accident.  The diagnoses were closed head injury, right frontal bone fracture, sinus fracture, occipital skull fracture, right frontal laceration, right occipital laceration, right orbital floor fracture and right temporal bone fracture.  (Tr. 266-268).

The transcript contains some records from plaintiff's primary care physician, Dr. Secundino Rubio.  Dr. Rubio's notes are, for the most part, handwritten and difficult to decipher.  On September 3, 2010, plaintiff complained of feeling dizzy and light headed.  He told Dr. Rubio that there were increased demands at work, including lifting and bending.  He denied any visual changes. Dr. Rubio noted that plaintiff's eyes were normal. (Tr. 295).  On September 7, 2010, he told Dr. Rubio that he could not keep up with the fast pace of the line at work.  He had become dizzy at work.  Dr. Rubio noted that he had no nystagmus.

(Tr. 296).[2]

An MRI of the brain was done at St. Louis University Hospital on October 4, 2010. This study showed no acute brain parenchymal abnormality or region of abnormal enhancement. (Tr. 236).

Dr. Adrian Feinerman performed a consultative physical exam on January 12, 2011. Plaintiff complained of dizziness since his head injury and said that he had headaches every other day. He denied blurred vision. Dr. Feinerman did not record a complaint of sensitivity to light. On exam, his pupils were round and equal, and reacted to light and accommodation. (Tr. 242-250).

Plaintiff was seen by Dr. Steven Brenner in the neurology department at St. Louis University Hospital on January 24, 2011. Mr. Rybacki complained of worsening headaches and dizziness. He said he was having headaches "about every day" and was taking Excedrin daily. Dr. Brenner ordered a CT angiogram to investigate whether plaintiff was developing a posttraumatic aneurysm. (Tr. 255-260). The CT angiogram showed no evidence of aneurysm, vascular malformation or large vessel occlusion. (Tr. 284-286).

Harry Deppe, Ph.D., performed a consultative psychological exam on August 23, 2012. Dr. Deppe wrote that plaintiff said he "continues to occasionally have headaches." There was no mention of a complaint of sensitivity to light. (Tr. 308-311).

The next record from Dr. Brenner is dated October 10, 2012. Plaintiff had a

---

[2] Nystagmus describes involuntary, rapid movement of the eye or eyes, which may be up and down, side to side, or rotary, and are caused by abnormal function in the areas of the brain that control eye movement. See, http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm, accessed on January 27, 2015.

number of complaints, including memory loss and irritability, headaches, and blurring of his vision. On exam, the cranial nerves were normal "except right pupil larger than the left and he has poorly reactive left pupil, as well as impaired hearing right ear." (Tr. 319). He referred plaintiff to the neuro-ophthalmology department. (Tr. 318). Plaintiff also complained of increasing neck pain, so Dr. Brenner ordered an MRI of the cervical spine. In addition, Dr. Brenner ordered an MRI of the brain as plaintiff complained of headache. Under "instructions," Dr. Brenner wrote "Severe headaches, eye sensitivity to light and blurred vision. Referring to neuro-ophthalmology." (Tr. 320).

The MRI of the brain showed "a few nonspecific bifrontal T2/FLAIR hyperintensities which may be related to prior trauma, similar in appearance to prior study. The cervical MRI showed mild degenerative disc disease at C5-6 and C6-7. (Tr. 321-323).

There is no record of a visit with the neuro-ophthalmology department at St. Louis University Hospital.

**5.    Opinion of Treating Doctor**

Dr. Brennan wrote a letter in April, 2012, stating that he had been treating plaintiff for his head injury for a number of years and that, since the injury, plaintiff "has experienced frequent if not constant headaches which have been poorly responsive to commonly utilized medicines…." He also stated that the basal skull fracture affected the structures involved in hearing and balance in the inner ear, and caused him to have headaches. The letter does not mention any problem with plaintiff's eyes or sensitivity to light. (Tr. 299-300).

## Analysis

Plaintiff argues that the ALJ ignored his complaint of being sensitive to light. He points to Dr. Brenner's findings that right pupil was larger than the left and his left pupil was poorly reactive, as supportive of that complaint.

It is not accurate to say that the ALJ completely ignored the complaint of sensitivity to light. He acknowledged several times that plaintiff testified that he needed to be in a dark room when he was having a headache. See, Tr. 23, 25. He also acknowledged that plaintiff said that he wore sunglasses "to try to avoid headaches." See, Tr. 22. It is, however, accurate to say that the ALJ ignored evidence which supported his claim.

The ALJ ignored Dr. Brenner's findings as to the unequal size of his pupils and reactivity of the left pupil. The ALJ described the visit of October 10, 2012, at Tr. 24. The ALJ wrote that "His exam was unremarkable except that he did have impaired hearing in his right ear and an impaired tandem gait."

The ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The Commissioner tacitly agrees that the ALJ ignored Dr. Brenner's findings about plaintiff's pupils. She argues that no medical source linked these findings to Mr. Rybacki's compliant of sensitivity to ordinary light levels. This argument is

based on a selective reading of Dr. Brenner's records. At Tr. 318, in the lower third of the page, Dr. Brenner gave his reasons for referring plaintiff to the neuro-ophthalmology department. He referenced "poorly responsive left pupil, and right pupil is larger." At Tr. 320, Dr. Brenner wrote "Severe headaches, eye sensitivity to light and blurred vision. Referring to neuro-ophthalmology." Read as a whole, Dr. Brenner's notes from the visit of October 10, 2012, connected the abnormal findings with regard to plaintiff's pupils with his complaint of sensitivity to light.

      The Commissioner also argues that the ALJ's general statement that "the objective evidence of record is not supportive of [Rybacki's] extreme allegations" is sufficient. See, Doc. 24, pp. 9-10. This argument is supported by the Commissioner's review of the medical evidence, evidence that was, in large part, not analyzed by the ALJ. The Commissioner argues that the single instance of abnormal findings with regard to plaintiff's pupils is outweighed by other normal exams, and there is no evidence that plaintiff was actually seen by a neuro-ophthalmology specialist. This argument is problematic, for two reasons. First, the fact that no abnormalities were noted in earlier exams does not negate the proposition that plaintiff later developed a problem with his eyes, or that a prior problem had worsened. More to the point, the ALJ himself did not discount Dr. Brenner's findings as inconsistent with the rest of the evidence. Rather, he failed to mention them at all. Even worse, he mischaracterized the results of Dr. Brenner's exam, describing them as "unremarkable except that he did have impaired hearing in his right ear and an impaired tandem gait."

In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, *SEC v. Chenery Corporation,* 318 U.S. 80 (1943). "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). See also, *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014), in which the Seventh Circuit criticized the government for repeatedly violating the *Chenery* doctrine in defending social security cases.

The ALJ is required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). ALJ Hafer simply failed to do so here. Instead, he erred by presenting only a "skewed version of the evidence." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). As a result, his decision is lacking in evidentiary support and must be remanded. *Minnick v. Colvin*, __ F.3d __, 2015 WL 75273, *7 (7th Cir. 2015); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Rybacki was disabled at the relevant time, or that he should be awarded benefits for the period in question. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Dennis Rybacki's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to

sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   January 28, 2015.**

 

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**